**SIRI & GLIMSTAD LLP**
Mason Barney (*Pro Hac Vice to be filed*)
Email: mbarney@sirillp.com
Ursula Smith (*Pro Hac Vice to be filed)*
Email: usmith@sirillp.com
745 Fifth Ave, Suite 500
New York, NY 10151
Telephone: 212-532-1091
Facsimile: 646-417-5967

**PRECEPT GROUP, LLP**
Christopher Wren Czaplak (Cal. Bar No. 338818)
Email: chris@precept.co
8030 La Mesa Blvd., #268
La Mesa, CA 91942
Telephone: 619-354-4434
Facsimile: 866-265-7238

Attorneys for Plaintiffs and Class

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| KERRY LAMONS, MALISSA WEBBER, ABIGAIL AVERILL, KELLY WHITTAKER, TAMMY MITCHELL, AERIAL MOTON, CHRISTINE FORD, KIMESHA HUGGINS, WILLIE WALSON III, SHAMAKA AUGUST-GONZALEZ, JOSEPH DIGIACINTO, RAFAEL CRUZ, TERI MUSIC, TIFFANY K. DANIELS, and HEATHER RUNDELL on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> Jury Trial Demanded |

1

KIA AMERICA, INC., a California corporation, and HYUNDAI MOTOR AMERICA, a California corporation,

Defendants.

Plaintiffs Kerry Lamons, Malissa Webber, Abigail Averill, Kelly Whittaker, Tammy Mitchell, Aerial Moton, Christine Ford, Kimesha Huggins, Willie Walson III, Shamaka August-Gonzalez, Joseph DiGiacinto, Rafael Cruz, Teri Music, Tiffany K. Daniels and Heather Rundell bring this proposed class action on behalf of themselves and all others similarly situated, by and through counsel, against Defendants Kia America, Inc. ("Kia") and Hyundai Motor America ("Hyundai" and collectively Kia and Hyundai are "Defendants"), and hereby state as follows:

**INTRODUCTION**

1.     Plaintiffs and Class Members purchased or leased vehicles equipped with traditional "insert-and-turn" steel key ignition systems manufactured by Kia between 2011 and 2022 or manufactured by Hyundai between 2015 and 2022 ("Class Vehicles"). Unlike most vehicles, the Class Vehicles are not equipped with an "immobilizer." Such devices, if installed, would immobilize the vehicle by preventing it from being started unless a code was transmitted from the vehicle's specific smart key.

2.     The lack of an immobilizer installed is a security vulnerability (the "Defect") that makes the Vehicles easy to steal, allowing thieves to steal Vehicles by simply opening the steering columns and using a common USB charging cord or similar metal object to start the engine.

3.     Viral videos on TikTok and YouTube give step-by-step instructions on how to steal Class Vehicles without a key, and reports of stolen Kia and Hyundai Vehicles have skyrocketed across the country. In fact, the "Kia Challenge," widely shared on social media platforms, dares people to break into Kia vehicles, and then use a common USB cord to start the cars. The videos show teens and young adults going for joy rides and in

2

some cases, even abandoning or crashing the cars. The incidents have turned dangerous, with suspects and bystanders being seriously injured or killed following unsafe driving and crashes related to the thefts.

4.     Defendants knew or should have known of the Defect. Defendants failed to disclose and actively concealed the Defect from the public, and continue to manufacture, distribute, and sell the Vehicles without disclosing the Defect.

5.     Plaintiffs seek damages and equitable relief on behalf of themselves and all others similarly situated.

**JURISDICTION AND VENUE**

6.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005, because the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and because this is a class action in which the members of the classes and Defendants are citizens of different states.

7.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, for state law claims because such claims stem from part of the same case or controversy arising from a common nucleus of operative fact.

8.     Venue is proper in this district as Defendants operate corporate headquarters in this district, and one or more of Defendants' acts and those events complained of occurred herein, pursuant to 28 U.S.C. § 1391.

**PARTIES**

9.     Plaintiff Kerry Lamons ("Ms. Lamons") is a citizen of California and resides in Indio, California. Ms. Lamons' primary vehicle is a 2020 Hyundai Kona SEL which is registered in her name.

10.    Plaintiff Malissa Webber ("Ms. Webber") is a citizen of Michigan and resides in Grand Rapids, Michigan. Ms. Webber's primary vehicle, prior to the vehicle

being stolen and damaged, was a 2020 Kia Forte which was previously registered in her name. Ms. Webber's current primary vehicle is a 2023 Kia Forte GT, which is registered in her name.

11.     Plaintiff Abigail Averill ("Ms. Averill") is a citizen of Michigan and resides in Wyoming, Michigan. Ms. Averill's primary vehicle, a 2020 Kia Forte, registered in her name, was stolen, damaged, recovered and repaired.

12.     Plaintiff Kelly Whittaker ("Ms. Whittaker") is a citizen of Michigan and resides in Detroit, Michigan. Ms. Whittaker's former primary vehicle was a 2018 Hyundai Tucson, registered in her name, before the vehicle was stolen. The whereabouts of Ms. Whittaker's vehicle is currently unknown.

13.     Plaintiff Tammy Mitchell ("Ms. Mitchell") is a citizen of Michigan and resides in Grand Rapids, Michigan. Ms. Mitchell's primary vehicle, a 2016 Hyundai Tucson, registered in her name, was stolen, damaged, recovered and is in the process of being repaired.

14.     Plaintiff Aerial Moton ("Ms. Moton") is a citizen of Texas and resides in Houston, Texas. Ms. Moton's primary vehicle, a 2019 Kia Optima, registered in her name, was stolen, damaged, recovered and is in the process of being repaired.

15.     Plaintiff Christine Ford ("Ms. Ford") is a citizen of Tennessee and resides in Greenbrier, Tennessee. Ms. Ford's primary vehicle, a 2013 Kia Optima EX, registered in her name, was stolen, damaged, recovered, and deemed totaled.

16.     Plaintiff Kimesha Huggins ("Ms. Huggins") is a citizen of Illinois and resides in Chicago, Illinois. Ms. Huggins' primary vehicle, a 2019 Hyundai Tucson, was registered in her name, was stolen, damaged, recovered and is in the process of being repaired.

17.     Plaintiff Willie Walson III ("Mr. Walson") is a citizen of Missouri and resides in St. Louis, Missouri. Mr. Walson's primary vehicle, a 2018 Kia Optima LX, registered in his name, was stolen, damaged, recovered, and deemed totaled.

CLASS ACTION COMPLAINT

18.     Plaintiff Shamaka August-Gonzalez ("Ms. Gonzalez") is a citizen of California and resides in Long Beach, California. Ms. Gonzalez's primary vehicle is a 2015 Kia Sorento which is registered in her name.

19.     Plaintiff Joseph DiGiacinto ("Mr. DiGiacinto") is a citizen of California and resides in Cotati, California.  Mr. DiGiacinto's primary vehicle is a 2015 Kia Sorento which is registered in his name.

20.     Plaintiff Rafael Cruz ("Mr. Cruz") is a citizen of Pennsylvania and resides in Philadelphia, Pennsylvania.  Mr. Cruz's primary vehicle is a 2015 Kia Sorento which is registered in his name.

21.     Plaintiff Teri Music ("Ms. Music") is a citizen of Oklahoma and resides in Edmond, Oklahoma. Ms. Music's primary vehicle is a 2018 Hyundai Elantra which is registered in her name.

22.     Plaintiff Tiffany K. Daniels ("Ms. Daniels") is a citizen of Indiana and resides in Indianapolis, Indiana. Ms. Daniels' primary vehicle is a 2013 Hyundai Sonata which is registered in her name.

23.     Plaintiff Heather Rundell ("Ms. Rundell") is a citizen of Michigan and resides in Grand Rapids, Michigan. Ms. Rundell's primary vehicle is a 2022 Kia Sportage which is registered in her name.

24.     Defendant Kia America, Inc. is a California corporation with a principal place of business at 111 Peters Canyon Road, Irvine, California 92606.

25.     Defendant Hyundai Motor America is a California corporation with a principal place of business at 10550 Talbert Avenue, Fountain Valley, California 92708.

26.     All of the above paragraphs are incorporated into the following factual allegations and claims as if fully set forth therein.  Each of the following facts are incorporated into all of the others as if fully set forth therein.

CLASS ACTION COMPLAINT

**FACTUAL ALLEGATIONS**

27.     An immobilizer is an anti-theft mechanism that prevents a vehicle's engine from starting unless the correct ignition key or other device is present. This is accomplished by radio frequency identification between a transponder in the ignition key and a device called a radio frequency reader in the steering column. When the key is placed in the ignition, the transponder sends a signal with a unique identification code to the reader, which relays it to a receiver in the vehicle's computer control module. If the code is incorrect or absent, the computer disables the system, and the car will be unable to start.

28.     By disabling the ignition electronically through the computer, an immobilizer prevents the vehicle from being stolen by a thief that starts a car's engine through a technique referred to as "hot wiring." Hot wiring involves breaking the steering column open and connecting the ignition wires by hand rather than turning a key to connect them. When the ignition systems are disabled by the car's computer, this theft method doesn't work; even with the wires connected, the car still won't start.

29.     Immobilizers are so effective at preventing theft that they are offered standard on most cars made in the last 20 years. Furthermore, immobilizers are required in all new vehicles sold in the European Union as of 1998, Australia as of 2001 and Canada as of 2007.[1]  The use of immobilizers have been critical to vehicle theft reductions in Australia, Germany, the Netherlands, the United States and the United Kingdom.[2]

_____

[1]   *How do car immobilizers work?* LockedInnOut (May 20, 2022), *available at* https://www.lockedinnout.com/how-do-car-immobilizers-work/;           (*Immobilisers,* Autospark,     *available     at*     https://autospark.com.au/products/remote-access-security/immobilisers/ (last visited August 30, 2022) ; *Vehicle Immobilizers,* Autos (January 16, 2008), *available at* https://www.autos.ca/auto-tech/auto-tech-vehicle-immobilizers/#:~:text=Transport%20Canada%20Standard%20CMVSS114%2C%20which%20became%20law%20on,vehicles%20to%20be%20equipped%20with%20an%20Immobilizer%20system.

[2]*Farrell, Graham et al., Elegant Security: Concept, evidence and implications,* European

_____

30. Kia and Hyundai, however, have largely refused to implement immobilizers as standard technology in virtually all of their vehicle lines. Defendants have long been aware of the anti–theft benefits attendant to making immobilizers a standard feature on their vehicles based on the immobilizer mandates of other countries in which Kia and Hyundai sell their vehicles. Kia and Hyundai sell virtually identical vehicles to the Class Vehicles in countries with immobilizer requirements but have largely failed to equip vehicles sold in the United States with the same immobilizer technology designed to prevent auto theft.

31. Immobilizers are relatively inexpensive, typically costing between $22.00 to $38.00 per car. Nevertheless, such technology is not mandated by law in the United States, and on information and belief, Kia and Hyundai refused to standardize this technology on all Class Vehicles in order to save money and increase profits there. Defendants were able to save hundreds of thousands of dollars or more by not installing immobilizers in its vehicles sold in the United States.

32. Thefts of Kia and Hyundai vehicles have dramatically increased since the news of the manufacturing defect became widely publicized. For example, the Los Angeles Police Department issued an alert cautioning owners of Kia and Hyundai vehicles that the social media challenge has resulted in increased vehicle thefts, and that thefts Kia and Hyundai vehicles have increased 7% in 2022 and account for 20% of all vehicle thefts in Los Angeles.[3] Also, St. Paul, Minnesota police reported at 1,300% increase in Kia thefts and a 584% increase in Hyundai thefts compared to last year,[4] and

Journal of Criminology (June 24, 2020), *available at* https://journals.sagepub.com/doi/10.1177/1477370820932107.

[3] *TikTok Blamed in Auto Thefts,* Valley Press (August 30, 2022), *available at* https://www.avpress.com/news/tik-tok-blamed-in-auto-thefts/article_75f96018-2810-11ed-9c8b-97a05d4ede3d.html.

[4] *Thefts Of Hyundai And Kia Models Are Soaring Throughout The U.S.*, Carscoops (July 25, 2022), *available at* https://www.carscoops.com/2022/07/thefts-of-hyundai-and-kia-models-are-soaring-throughout-the-u-s/.

7

the Chicago Police Department reported a 767% increase in Hyundai and Kia thefts since the beginning of July 2022 compared to last year.[5]  Similar spikes in thefts of Class Vehicles have been reported across cities in the United States, including Grand Rapids, Memphis, St. Louis, Cincinnati, and Columbus.[6] Law enforcement agencies have recommended that Hyundai and Kia owners use a theft prevention tool, such as a steering wheel lock, as a result of the increase in thefts of Class Vehicles.[7]

33.    Additionally, Plaintiffs Lamons, Gonzalez, and DiGiacinto and Class Members who reside in California, face an increased threat on top of the preexisting problem of vehicle theft in California. In 2020, three of the top ten U.S. metropolitan statistical areas for motor vehicle theft measured by theft rates were in California.[8]

34.    The cost to repair stolen hot-wired vehicles is substantial, including repair to the windows and steering column which can cost $3,000, as well as other damage as a result of joyriding by thieves, which can often exceed $10,000.[9]

35.    Plaintiffs and Class Members will also face increased insurance premiums and diminution in value of the Class Vehicles.  Given the publicity of this defect as a

---

[5] *TikTok car theft challenge: Chicago area sees 767% increase in Hyundai, Kia thefts,* Fox News (August 25, 2022), *available at* https://www.foxnews.com/us/tiktok-car-theft-challenge-chicago-area-sees-767-percent-increase-hyundai-kia-thefts.

[6] *Thefts Of Hyundai And Kia Models Are Soaring Throughout The U.S.*, Carscoops (July 25, 2022), *available at* https://www.carscoops.com/2022/07/thefts-of-hyundai-and-kia-models-are-soaring-throughout-the-u-s/.

[7] *Hyundai, Kia models at higher risk of theft, and of course it's on TikTok,* AutoBlog (August 2, 2022), *available at* https://www.autoblog.com/2022/08/02/hyundai-kia-thefts-tiktok/.

[8] Facts + Statistics: Auto theft, Insurance Information Institute (2020), *available at* https://www.iii.org/fact-statistic/facts-statistics-auto-theft (last visited August 28, 2022).

[9] *Motor vehicle thefts in Milwaukee are up 152%. Auto repair businesses say the worst may be yet to come*, Milwaukee Journal Sentinel (February 3, 2021), *available at* https://www.jsonline.com/story/news/solutions/2021/02/03/motor-vehicle-thefts-up-152-milwaukee-so-far-2021/4266701001/.

CLASS ACTION COMPLAINT

result of the Kia Challenge and other coverage, the increased theft risk is well known and will decrease demand for the cars, thereby depressing their value.

36.     Notably, the Vehicles fail to comply with Federal Motor Vehicle Safety Standard ("FMVSS") 114, which requires: "Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents: (a) The normal activation of the vehicle's engine or motor; and (b) Either steering, or forward self - mobility, of the vehicle, or both."

37.     If the Vehicles were manufactured to comply with this FMVSS, they would not be stolen at such alarming rates because when the key is removed from the starting system, both steering and forward self-mobility would be prevented.

38.     Belatedly recognizing the gravity of the problem, Defendants have announced that all new model vehicles will be equipped with an immobilizer.[10] But this change offers little consolation to the thousands of consumers whose defective Vehicles remain vulnerable to theft.

39.     Defendants have long known the security benefits offered by immobilizers. Indeed, Defendants have been selling virtually identical vehicles equipped with immobilizers overseas for decades, and have even incorporated immobilizers as standard technology into select higher–end models, but Defendants have simply refused to follow their competitors by making it standard technology on their lower–cost brands. Defendants knew or should have known of the ease with which the Class Vehicles may be stolen. Upon information and belief, Defendants have known of the unusually high rate of thefts experienced by Class Vehicles for many years, through scores of customer complaints relayed through their dealers.

40.     Moreover, Defendants knew or should have known of the method of theft of the Vehicles because they sell replacement parts to dealerships and autobody shops

---

[10] *Hyundai, Kia Take Action after Cars Become Theft Targets in Milwaukee*, Car and Driver (December 11, 2021), *available at* https://www.caranddriver.com/news/a38491394/hyundai-kia-thefts-milwaukee-action/.

9

around the country that are needed to repair the stolen Vehicles. Because the Vehicles are stolen in the same way, Defendants would have experienced a spike in orders for the same replacement parts.

41.     Despite this knowledge, Defendants continued to sell the Class Vehicles, knowingly flooding the market with unsafe cars susceptible to theft, without warning customers. Only when the problem became too large and well publicized to ignore did Defendants decide to introduce immobilizer technology to all future new vehicles going forward.

42.     Meanwhile, Plaintiffs and the Class Members who have previously purchased the Vehicles remain vulnerable.

**Plaintiff Malissa Webber**

43.     In November 2019, Plaintiff Ms. Webber purchased a new 2020 Kia Forte from Kia of North Grand Rapids in Grand Rapids, Michigan, previously named Summit Place Kia. At the time of purchase, the salesman reassured Ms. Webber that the Forte she was purchasing was equipped with an alarm system. Ms. Webber was not informed that the Forte was not equipped with an immobilizer.

44.     Ms. Webber was aware of the increased theft reports of Kia vehicles in Grand Rapids and she was cautious about where she parked her Kia Forte, making sure at all times that the vehicle was in an area that was well-lit at night.

45.     On the evening of June 30, 2022, Ms. Webber parked her vehicle under a light in her apartment complex only three parking spots from her apartment in Grand Rapids.

46.     In the morning on July 1, 2022, a police officer knocked on Ms. Webber's door to inform her that her Kia Forte had been stolen and found abandoned with damage and the engine running. The Forte was found with a broken window, broken ignition plate, front and rear end damage, scratches and had been driven approximately 1,000

1  miles. The interior of the vehicle was wet from rainwater entering through the broken

2  window.

3      47.    Ms. Webber discovered that the alarm system on her Kia Forte would not

4  alert when a rear window was broken, which thieves had discovered and exploited. The

5  rear side window of Ms. Webber's Kia had been broken, where a thief had climbed inside

6  the vehicle, removed the ignition plate and used her USB charging cord to turn on the

7  vehicle and drive it away.

8      48.    The contents of Ms. Webber's Kia were found in various parking lots within

9  a fifteen-mile radius of her house. The police returned to Ms. Webber's home on

10 numerous occasions for her to identify personal items that were removed from her Kia.

11 Intermixed with her property were the property of other victims of car theft.

12     49.    A second detective was assigned to Ms. Webber's case after the original

13 detective was reassigned after being involved in a vehicle theft in progress by armed

14 perpetrators who fired upon the detective. This caused delay in the forensic analysis of

15 Ms. Webber's vehicle, which further delayed the repairs and return of her vehicle.

16     50.    The local repair shop was so saturated with repairs of stolen vehicles that

17 Ms. Webber's vehicle was towed 45 minutes away to be repaired in Holland, Michigan.

18 Despite this repair shop having availability, the replacement parts for Ms. Webber's Kia

19 caused further delay in the repair of her vehicle.

20     51.    Ms. Webber picked up her vehicle on August 26, 2022, nearly two months

21 after the vehicle was stolen. After asking about the installation of an immobilizer, she

22 was informed it would be very expensive and would require the vehicle to be re-wired.

23 She was informed that she would be "better off" getting a new vehicle instead of installing

24 an immobilizer.

25     52.    Ms. Webber paid her insurance company the $500 deductible for the repair

26 of her vehicle, plus $30 for new tires which she was told was an "upgrade." Additionally,

27 Ms. Webber was forced to incur rental car fees of $25 per day.

28

53.     Ms. Webber was unable to pay her car payment, the deductible and $25 each day for a rental car so she frequently was without transportation.  As a result of her lack of transportation, she was fired from her job as a Medical Management Specialist on the other side of Grand Rapids.  After looking into bus transportation, she discovered that it would take three hours each way for her to get to her job and was fired as a result of not being able to spend six hours per day using bus transportation. Ms. Webber was unable to spend six hours on a daily bus commute because she could not leave her daughter home alone.

54.     Ms. Webber suffered anxiety as a result of the fear of her vehicle being stolen a second time.  After being told of the cost of adding additional security to her Kia Forte, she reluctantly agreed to trade in the vehicle for a 2023 Kia Forte GT, which she did not want, but felt like she had no other choice.

55.     Ms. Webber's new vehicle payment is $250 per month more than her previous vehicle payment, and her insurance premium dramatically increased.

56.     As a result of the theft of her Kia Forte, Ms. Webber has suffered financial hardship by bearing the financial burden of a higher vehicle payment, increased insurance premiums, rental car costs, deductible payment and the loss of her employment.

57.     Ms. Webber and her husband have had to decrease expenses as a result of this financial hardship caused by the theft of her Kia, and have bought less groceries, canceled cable television service, and have stopped turning on lights during the day and night to save utility expenses. Additionally, Ms. Webber has been forced to sell her personal property to conserve financial resources.

**Plaintiff Abigail Averill**

58.     Ms. Averill's 2020 Kia Forte was stolen from the mall in Grand Rapids, Michigan while Ms. Averill was at the movie theater on July 25, 2022. When Ms. Averill was leaving the mall she received a call from the Grand Rapids Police Department that they had recovered her vehicle.

59.     Ms. Averill's work laptop and work identification badge were stolen from the vehicle and were not recovered. The vehicle was found damaged, including exterior scratches, a broken fender, a broken rear passenger side window, a broken ignition plate, and interior stains from an unknown substance.

60.     Ms. Averill paid her insurance deductible of $1,000 and was without a vehicle from July 25, 2022 to September 3, 2022 while her Forte was being repaired.

61.     Ms. Averill's vehicle will need further repairs but she has been informed that the necessary parts are on backorder and are currently unavailable.

62.     Ms. Averill was forced to borrow her parents' vehicle due to the cost of renting a car which was a hardship for her parents.

63.     Ms. Averill is suffering from anxiety due to the risk of her vehicle being stolen again but is unable to replace the vehicle due to the decreased trade-in-value of her Forte.

**Plaintiff Kelly Whittaker**

64.     Ms. Whittaker's 2018 Hyundai Tucson was stolen from her driveway in Detroit, Michigan on August 14, 2022.  The vehicle has not been recovered.

65.     Ms. Whittaker is a single mother, and the loss of her vehicle has caused her and her children tremendous hardship.

66.     Prior to renting a vehicle, Ms. Whittaker was unable to go to the grocery store or take her children to school or athletic practices and games. Ms. Whittaker and her children missed medical appointments and Ms. Whittaker was forced to pay for medical appointments that she was unable to attend. Ms. Whittaker was also forced to miss several days of work.

67.     Ms. Whittaker's son is unable to practice for his driver's test because he is not authorized to driver her rental vehicle.  Additionally, on more than one occasion her younger child has been unable to find her vehicle when she picks him up from school because she has frequently changed rental vehicles.

13

68.     In addition to paying for rental cars in the amount of over $1,600, Ms. Whittaker has been forced to pay her monthly payment and insurance deductible.

69.     When Ms. Whittaker's insurance company processes her claim, they will pay off the balance of her vehicle loan, which will result in Ms. Whittaker being forced to pay another down payment on a replacement vehicle.

70.     Until Ms. Whittaker's insurance company pays the balance on her stolen vehicle loan, she will be forced to pay her car payment and the rental car costs, which has caused her financial hardship.

**Plaintiff Tammy Mitchell**

71.     Ms. Mitchell's 2016 Hyundai Tucson was stolen on July 23, 2022 from her apartment complex in Grand Rapids, Michigan.

72.     The vehicle was recovered by the police and transferred to impound where it was later towed to Fox Hyundai Grand Rapids and then transferred to Fox Collision Center for faster repair.

73.     Prior to the theft of the vehicle, the 2016 Hyundai Tucson was the couples' sole vehicle.

74.     Ms. Mitchell's husband's wallet was stolen from the vehicle during theft, which required him to replace his identification and credit cards.

75.     The vehicle sustained damage to the rear door, a broken window, broken steering column, electrical damage including broken power locks, water damage due to the broken window, and interior stains on the seats.

76.     Ms. Mitchell's insurance company would only reimburse her for a 30-day rental vehicle. As a result, Ms. Mitchell has been relying on family members for transportation which is unreliable and inconvenient.

77.     As of the date of this filing, the Hyundai Tucson is still under repair with no estimated date of return due to parts on backorder.

78.    Ms. Mitchell and her husband have been without access to their vehicle or a rental vehicle for over a month. During this time, Ms. Mitchell's husband has missed work and Ms. Mitchell has missed doctor's appointments.

79.    Ms. Mitchell's insurance company informed her on September 15, 2022 that they planned to declare her vehicle a total loss.

80.    Ms. Mitchell has suffered financial harm as a result of her vehicle theft, including the payment of a $1,000 insurance deductible plus her car monthly car payment without having access to a vehicle.

81.    Ms. Mitchell has suffered from anxiety as a result of the theft of her vehicle and is concerned she will not have the financial means to replace the vehicle.

### Plaintiff Aerial Moton

82.    Ms. Moton's 2019 Kia Optima was stolen from her residence in Houston, Texas on or about September 9, 2022.

83.    Ms. Moton's vehicle was recovered on September 13, 2022. The police apprehended a suspect who was driving the vehicle. The vehicle had been damaged, including a broken rear passenger window, damaged steering column and broken right bumper.

84.    Ms. Moton is waiting for a repair estimate from the collision shop.

85.    Ms. Moton has been using a relative's vehicle while waiting for her vehicle to be repaired.

86.    Ms. Moton has suffered anxiety as a result of the risk of her vehicle being stolen again, and will be installing an alarm system and GPS tracking device on her vehicle, at her own personal expense.

### Plaintiff Christine Ford

87.    Ms. Ford's 2013 Kia Optima EX was stolen from her residence in Greenbrier, Tennessee in or about October 2020.  The vehicle was driven over 150 miles

15

from her residence where the police attempted to apprehend the suspects, resulting in a vehicle crash and a total loss.

88.     Ms. Ford's insurance company paid the remainder of her vehicle loan after she was forced to pay her deductible. Ms. Ford was left with no remaining funds to put toward another vehicle.

89.     Ms. Ford's insurance company offered reimbursement up to $25 per day toward a rental vehicle, but Ms. Ford was unable to pay the up-front costs which exceeded $25 per day.

90.     Ms. Ford was forced to borrow a vehicle from a family member because she was not able to cover the up-front cost of the rental vehicle and the difference in price between the rental cost and the insurance reimbursement for a rental vehicle.

91.     Prior to the vehicle being stolen, Ms. Ford had only owned the vehicle for 11 months.  The Kia Optima was Ms. Ford's "dream car" and she was devastated by the theft and total loss of her vehicle.

92.     Ms. Ford was forced to save money for a down payment on a replacement vehicle, which took her four months.  Ms. Ford works as a Certified Nurse Assistant in a long-term care facility and is a single mother of three minor children.

93.     Ms. Ford missed a substantial amount of work due to the loss of her family vehicle, which resulted in her dropping from full-time work to part-time work and by extension, the loss of her healthcare insurance coverage. Additionally, her children have missed school as a result of her loss of transportation.

94.     Ms. Ford was able to save up enough money after four months to put a down payment on another used vehicle, a 2014 Ford Fusion.  Ms. Ford's replacement vehicle only lasted for six months before the transmission needed to be replaced, which resulted in her trading the vehicle in for another used vehicle, a 2012 Acura.

95.     Ms. Ford has suffered tremendous financial hardship as a result of the theft of her Kia, which has caused her to suffer from increased anxiety.

16

**Plaintiff Kimesha Huggins**

96.    Ms. Huggins' 2019 Hyundai Tucson was stolen from her residence in Chicago, Illinois on or about September 14, 2022.

97.    Ms. Huggins filed a police report and notified her insurance company of the vehicle theft.

98.    Ms. Huggins paid her $500 insurance deductible and was informed that the insurance company would reimburse up to $20 per day for a rental vehicle. Ms. Huggins paid over $400 for a 3-day rental vehicle and thereafter was unable to pay the portion of the cost of the rental vehicle not covered by her insurance.

99.    Ms. Huggins' vehicle was recovered several days later and towed to an auto body shop for repair.

100.    In addition to damage to the vehicle, including interior and exterior damage, the license plates and personal items were stolen from the vehicle.

101.    In addition to paying her deductible and car payment, Ms. Huggins has been forced to incur rental vehicle expenses and uber expenses for daily transportation.

102.    As a result of the loss of her sole household vehicle, Ms. Huggins' son has missed school because there is no bus transportation available. Ms. Huggins and her family have also missed church and medical appointments.

103.    Ms. Huggins' Hyundai only had 24,000 miles on the odometer.  When the vehicle is returned to her, she fears that the vehicle will be stolen again and would like to trade the vehicle in for a different make and model.  However, Ms. Huggins believes the vehicle has a diminished trade-in value as a result of the vehicle damage it sustained and because the vehicle is not equipped with an immobilizer device.  Additionally, Ms. Huggins is afraid that she will not be able to afford a replacement vehicle.

**Plaintiff Willie Walson III**

104.    Mr. Walson's 2018 Kia Optima LX was stolen from his residence in St. Louis, Missouri on or about August 21, 2022.

17

105.   Mr. Walson filed a police report and notified his insurance company of the vehicle theft.

106.   Mr. Walson's vehicle was found with damage, including damage consistent with the vehicle having been side-swiped on the driver's side of the vehicle. Mr. Walson was unable to fully open the driver's door when the vehicle was recovered. The vehicle also sustained water damage due to a broken window and damage to the steering column.

107.   At the time the vehicle was stolen, it had a full tank of gas, new tires and had been maintained according to the manufacturer's recommended maintenance schedule.

108.   Mr. Walson was unable to obtain a rental vehicle because of the lack of rental vehicles in supply in St. Louis.

109.   As a result of the lack of available transportation, Mr. Walson missed a close friend's wedding.

110.   As a result of the lack of available transportation, Mr. Walson has been forced to incur expenses from Uber and Instacart. Additionally, his personal property was stolen from the vehicle, including luggage and items of sentimental value.

111.   Mr. Walson has been forced to alter his lifestyle as a result of the lack of available transportation.

112.   The insurance company determined the vehicle was a total loss.

113.   The insurance company reimbursed Mr. Walson in the amount of $18,700 for the vehicle, which was in excellent condition prior to the theft of the vehicle. Mr. Walson believes that his vehicle was valued greater than the amount he was reimbursed by the insurance company.

## CLASS ALLEGATIONS

114.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and on behalf of all other persons similarly situated (the "Class").

115. Plaintiffs propose the following Class definitions, subject to amendment as appropriate:

**Nationwide Class**
*All individuals in the United States who purchased or leased a Class Vehicle.*

**California Subclass**
*All residents in the State of California who purchased or leased a Class Vehicle.*

**Texas Subclass**
*All residents in the State of Texas who purchased or leased a Class Vehicle.*

**Tennessee Subclass**
*All residents in the State of Tennessee who purchased or leased a Class Vehicle.*

**Illinois Subclass**
*All residents in the State of Illinois who purchased or leased a Class Vehicle.*

**Missouri Subclass**
*All residents in the State of Missouri who purchased or leased a Class Vehicle.*

**Oklahoma Subclass**
*All residents in the State of Oklahoma who purchased or leased a Class Vehicle.*

**Pennsylvania Subclass**
*All residents in the State of Pennsylvania who purchased or leased a Class Vehicle.*

19

**Indiana Subclass**
*All residents in the State of Indiana who purchased or leased a
Class Vehicle.*

116.   Excluded from each of the above Classes are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded are any Judge to whom this case is assigned as well as his or her judicial staff and immediate family members.

117.   Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

118.   Plaintiffs seek only damages and injunctive relief on behalf of themselves and the Class Members.

119.   Each of the proposed classes meet the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

120.   <u>Numerosity</u>**.** The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of thousands of individuals who have purchased or leased a Class Vehicle. The identities of Class Members are ascertainable through Defendants' records, Class Members' records, publication notice, self-identification, and other means.

121.   <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

        a.   Whether Defendants engaged in the conduct alleged herein;

        b.   Whether Defendants designed, advertised, sold, and placed the Class Vehicles into the stream of commerce;

CLASS ACTION COMPLAINT

c.  Whether Defendants sold the Class Vehicles with the defect described herein;

d.  Whether the Defect in the Class Vehicles is a safety and/or security defect that created a foreseeable risk of harm to Plaintiffs and the Class Members;

e.  Whether Defendants breached an implied contract with Plaintiffs and Class Members;

f.  Whether Defendants knew about the Defect in the Class Vehicles when they were sold;

g.  When Defendants learned about the Defect in the Class Vehicles;

h.  Whether Defendants concealed the Defect in the Class Vehicles;

i.  Whether Defendants conduct violates consumer protection statutes, warranty laws, and other laws asserted herein;

j.  Whether Class Members have suffered damages as a result of the conduct alleged herein, including the diminution of value of the Class Vehicles and deprivation of the benefit of the bargain; and

k.  Whether Plaintiffs and the Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

122.  <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs have a Vehicle with the same Defect.

123.  <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel is competent and experienced in litigating class actions, including actions related to the automotive industry.

124.  <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs and Class Members have

21

purchased or leased a Class Vehicle with the same Defect. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

125.   <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

126.   Class certification also is appropriate under Fed. R. Civ. P. 23(b)(2). Defendants have acted or have refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

127.   Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the Defect.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Magnuson Moss Warranty Act
### 15 U.S.C § 2301, *et seq.*
(On behalf of Plaintiffs and the Nationwide Class)

128.   Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs above as if fully set forth herein.

22

129.   Congress enacted the Magnuson Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq*., to address the widespread misuse of merchants' express warranties and to protect consumers from deceptive warranty practices. The MMWA imposes civil liability on any "warrantor" who fails to comply with any obligation under a written or corresponding implied warranty. Id. § 2310(d)(1).

130.   The Class Vehicles are "consumer products" as defined in 15 U.S.C. § 2301(1).

131.   Plaintiffs and members of the Class are "consumers" as defined in 15 U.S.C. § 2301(3).

132.   Kia and Hyundai are "suppliers" and "warrantors" as those terms are defined in 15 U.S.C. § 2301(4) & (5), respectively.

133.   In connection with the sale and/or lease of the Class Vehicles, Defendants supplied Plaintiffs and the Class with "written warranties" as that term is defined in 15 U.S.C. § 2301(6).

134.   15 U.S.C. § 2310(d)(1) provides that "a consumer who is damaged by the failure of the supplier, warrantor, or service contractor to comply with any obligation under [the MMWA], or a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief in any court of competent jurisdiction in any state."15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

135.   Defendants provided Plaintiffs and Class Members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the MMWA, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Defendants warranted that the Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

23

136.   Defendants breached their implied warranties, as described herein, and are therefore liable to Plaintiffs under 15 U.S.C. § 2310(d)(1). The Defect rendered the Class Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

137.   Plaintiffs used their respective Class Vehicles in a manner consistent with their intended use and performed every duty required of them under the terms of the warranty, except as may have been excused or prevented by Defendants' conduct or by operation of law.

138.   Plaintiffs and the Class seek to recover damages resulting directly from Defendants' breach of their implied warranties and their deceitful and unlawful conduct described herein. These damages include, but are not limited to, overpayment for the Class Vehicles, increased insurance premiums, the cost to incorporate an after-market immobilizer and/or the diminution in value of the Class Vehicles.

139.   The MMWA also permits "other legal and equitable" relief. 15 U.S.C. § 2310(d)(1). Plaintiffs seek reformation of Defendants' respective written warranties to comport with their obligations under the MMWA and with consumers' reasonable expectations. Plaintiffs also seek to enjoin Defendants from acting unlawfully as alleged herein.

140.   Finally, Plaintiffs intend to seek such an award as prevailing consumers at the conclusion of this case. The MMWA provides for an award of costs and expenses, including attorneys' fees, to prevailing consumers in the Court's discretion. 15 U.S.C. § 2310(d)(2).

**COUNT II**
**Breach of Implied Warranty**
(On Behalf of Plaintiffs and the Nationwide Class)

141.   Plaintiffs restate and reallege the allegations in paragraphs 1-127 as if fully set forth herein.

24

142.   As detailed herein, Defendants designed, manufactured, distributed, and sold the Class Vehicles knowing that consumers like Plaintiffs and the Class would purchase these products from Kia and Hyundai's authorized dealers as a means of transportation.

143.   As merchants of the Class Vehicles, Kia and Hyundai warranted to the Plaintiffs and the Class that the Class Vehicles were fit for the ordinary purpose for which they are used.

144.   Plaintiffs relied on this warranty to their detriment.

145.   The Class Vehicles are not "merchantable" because they are not reasonably fit for the ordinary purpose for which they are sold, which is to provide safe, reliable transportation. To the contrary, the Class Vehicles are prime targets of theft because of the Defect, which renders them unreliable and inconvenient for transportation.

146.   Sufficient privity of contract exists to assert this implied warranty claim.

147.   Defendants market and advertise the sale of the Class Vehicles in various media outlets across the United States, including to the Plaintiffs and the Class.

148.   Defendants advertise their authorized dealer network on their respective websites and task them with administering the promotional material and warranty information for new Class Vehicles to prospective consumers throughout the nation.

149.   Through Defendants' websites, consumers obtain information about vehicles; design specific vehicles to meet their needs; obtain information about the value of trade–in vehicles; request additional marketing materials; and request quotes for vehicles. Defendants then send these consumers to "authorized dealers" to consummate sales and leases.

150.   Defendants control various details regarding their dealers' operations through various written agreements, such as: (i) granting each dealer a license to use their respective trademarks and intellectual property; (ii) furnishing each dealer with marketing materials to assist in the sale of their vehicles; (iii) providing training to

CLASS ACTION COMPLAINT

dealership personnel to assist in their sales activities; and (iv) prohibiting their dealers from engaging in certain practices that otherwise detract from their respective brands or undermine the sale of their respective vehicles, including the Class Vehicles.

151.  Plaintiffs purchased and/or leased their respective Vehicles from "authorized dealers" with the understanding that these dealers were acting on behalf of Defendants.

152.  The sole and express purpose that each authorized Kia and Hyundai dealer has when it acquires the vehicles from Kia and Hyundai is to immediately re–sell them to the end–users like Plaintiffs and the Class Members.

153.  Defendants' conduct, and the conduct of their respective dealers, thus create a justifiable belief on the part of Plaintiffs and Class Members that the dealers are agents of Kia and/or Hyundai, which the Plaintiffs relied on to their detriment.

154.  Thus, each Kia and Hyundai dealership operates as the actual and/or apparent agent of the Defendants–manufacturers named herein, which satisfies any privity requirement.

155.  Moreover, the purchase and/or lease agreements between the Plaintiffs and their respective dealers were entered directly and primarily for Kia and Hyundai's benefit.

156.  Likewise, any contract whereby Defendants' authorized dealers acquire the Class Vehicles from Defendants to resell to the end–user is also for the express benefit of Plaintiffs and the Class. On information and belief, Defendants' authorized dealers make little money on the actual sale or lease of new vehicles, including the Class Vehicles.

157.  Plaintiffs and the members of the Class therefore have standing to assert implied warranty claims against Defendants by virtue of their status as intended, third–party beneficiaries of these dealership sales agreements, which further satisfies the privity requirement.

158.  Privity thus exists between Defendants on the one hand, and the Plaintiffs

159.   and the Class on the other by virtue of the express warranties provided through their purchase and/or lease agreements.

160.   Moreover, the MMWA provides that when a manufacturer offers a written warranty, it may limit the duration of an implied warranty to the duration of an express warranty, but it cannot disclaim implied warranties all together. *See* 15 U.S.C. § 2308(a) ("No supplier may disclaim or modify . . . any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer Product. . . ."). A manufacturer should not be permitted to avoid this prohibition by claiming an ostensible lack of privity when the manufacturer itself chose its distribution model.

161.   Imposing a rigid privity requirement in this case would permit Defendants to escape both the letter and spirit of the MMWA through their preferred distribution scheme; one in which the only parties in strict privity that can assert an implied warranty claim are Defendants' own dealers who would never need to assert the claim in the first instance.

162.   Consequently, any rigid application of a state law privity requirement would violate the Supremacy Clause and be preempted. *See* U.S. Const. art. VI ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

163.   As a direct and proximate result of Defendants' breach of these implied warranties, Plaintiffs and the Class have suffered damages, injury in fact, and ascertainable loss in an amount to be determined at trial. These damages include, but are not limited to, overpayment for the Class Vehicles, insurance premium increases, the cost to add an after-market immobilizer, and/or the diminution in value of the Class Vehicles as a result of the Defect.

CLASS ACTION COMPLAINT

164.    The circumstances described herein caused Defendants' exclusive or limited remedy to fail its essential purpose, such that the Plaintiffs and the Class may seek alternative remedies. Indeed, these warranties have denied the Plaintiffs and the Class the benefit of their respective bargains, which presupposes they were (or are) able to use the Class Vehicles in a meaningful manner without the ever–present and significantly elevated risk of them being stolen, due to their lack of an immobilizer anti-theft device.

165.    Further, Kia and Hyundai's exclusion and/or limitation of consequential damages in their New Vehicle Limited Warranties is unconscionable and void for the reasons stated above.

166.    Accordingly, the Plaintiffs and the Class are entitled to damages flowing from Defendants' breach of their implied warranties, as well as all consequential and incidental damages resulting from this breach.

167.    Plaintiffs and Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein. Affording Defendants a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

**COUNT III**
**Unjust Enrichment**
(On Behalf of Plaintiffs and the Nationwide Class)

168.    Plaintiffs restate and reallege the allegations in paragraphs 1-127 as if fully set forth herein.

169.    This claim is pleaded in the alternative to any contract–based claims. *See* Fed. R. Civ. P. 8(d)(2). Moreover, a claim for unjust enrichment is properly brought where, as here, Defendants contend that their warranties do not cover damages stemming from the Defect.

28

170.   Defendants profit off of new, leased and used Vehicles purchased by Plaintiffs and the Class Members.

171.   Every year, Defendants make millions of dollars in revenue selling and leasing new Vehicles through their respective dealer networks across the United States.

172.   Plaintiffs allege upon information and belief that consumers are permitted to buy Vehicles directly from Defendants, but that the proceeds flow through various dealers and/or related companies (e.g., their finance companies) back to Defendants.

173.   Accordingly, the purchase and lease of new Vehicles confers a direct monetary benefit on Defendants. Additionally, Defendants profit off the replacement parts needed to service and repair these Vehicles.

174.   Further, as more used Vehicles stay in the stream of commerce, Defendants' brand awareness rises, which is of substantial value to vehicle manufacturers. Defendants have touted their vehicles as not only reliable and durable, but also as having lower depreciation rates and ownership costs over their useful lives.[11]

175.   Defendants tout these benefits to promote the sale and lease of their new cars for pecuniary benefit.

176.   Accordingly, Plaintiffs and the Class conferred a benefit upon Defendants, whether directly, indirectly, or through one or more affiliate entities.

177.   Defendants knew and appreciated the benefits conferred upon them through the sale of the Class Vehicles to Plaintiffs and members of the Class. Many of the Vehicles were financed through Kia Motor Finance or Hyundai Motor Finance.

178.   Notably, federal law mandates that Kia and Hyundai maintain records of first–time purchasers of Class Vehicles, *see* 49 U.S.C. § 30117(b), and remain able to identify the owners of their used cars, including the owners of certain Class Vehicles, to

---

[11] *KIA SWEEPS INTELLICHOICE CPO AWARDS,* KIA Media (December 19, 2019), *available at* https://www.kiamedia.com/us/en/media/pressreleases/15857/kia-sweepsintellichice-cpo-awards.

---

comply with recall notification procedures under applicable law. *See id.* § 30119(d)(1)(A).

179.   Defendants have long represented to the consuming public that the Class Vehicles are safe, reliable, and durable even though they knew of the Defect. Not only did Defendants fail to equip the Class Vehicles with an industry standard anti–theft device, they failed to comply with FMVSS 114.

180.   As a result of Defendants' wrongful conduct, unsuspecting consumers like Plaintiffs and the Class overpaid for the Vehicles and incurred additional costs, thereby earning more profit.

181.   Defendants continued to market the Class Vehicles despite knowing that they were unsafe and susceptible to theft, foisting the cost they would otherwise have been forced to bear through a voluntary recall or otherwise on Plaintiffs and the Class.

182.   Under these circumstances, it would be unjust to allow Defendants to accept and retain the benefits identified herein without paying Plaintiffs and the Class them for their value.

## COUNT IV
## Fraud by Concealment
(On Behalf of Plaintiffs and the Nationwide Class)

183.   Plaintiffs restate and reallege the allegations in paragraphs 1- 127 as if fully set forth herein.

184.   Defendants intentionally concealed the Defect.

185.   Defendants further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Vehicles they were selling had no significant defects, that the Vehicles were reliable, and would perform and operate properly.

186.   Defendants knew about the Defect when these representations were made.

187.   The Vehicles purchased by Plaintiffs and the other Class Members contained the Defect.

188.   Defendants had a duty to disclose the Defect as alleged herein, because the Defect created a safety hazard and Plaintiffs and the other Class Members relied on Defendants' material representations.

189.   As alleged herein, at all relevant times, Defendants have held out the Vehicles to be free from defects. Defendants touted and continue to tout the many benefits and advantages of the Vehicles, but nonetheless failed to disclose important facts related to the Defect. This made Defendants' other disclosures about the Vehicles deceptive.

190.   The truth about the Defect was known only to Defendants; Plaintiffs and the other Class Members did not know of these facts and Defendants actively concealed these facts from Plaintiffs and Class Members.

191.   Plaintiffs and the other Class Members reasonably relied upon Defendants' deception. They had no way of knowing that Defendants' representations were false, misleading, or incomplete. As consumers, Plaintiffs and Class Members did not, and could not, unravel Defendants' deception on their own. Rather, Defendants intended to deceive Plaintiffs and Class Members by concealing the true facts about the Vehicles.

192.   Defendants' false representations and omissions were material to consumers because they concerned qualities of the Vehicles that played a significant role in the value of the Vehicles.

193.   Defendants had a duty to disclose the Defect and violations with respect to the Vehicles because details of the true facts were known and/or accessible only to Defendants, because Defendants had exclusive knowledge as to such facts, and because Defendants knew these facts were not known to or reasonably discoverable by Plaintiffs or Class Members.

194.   Defendants also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with their

31

Vehicles, without telling consumers that the Vehicles had a fundamental Defect that would affect the safety, quality, and performance of the Vehicle.

195. Defendants' disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the Defect as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Vehicles purchased by Plaintiffs and Class Members.

196. Defendants have still not made full and adequate disclosures and continue to defraud Plaintiffs and Class Members by concealing material information regarding the Defect.

197. Plaintiffs and Class Members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as much for cars with faulty technology, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class Members' actions were justified. Defendants were in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class Members.

198. Because of the concealment and/or suppression of facts, Plaintiffs and Class Members sustained damage because they own or lease Vehicles that are diminished in value as a result of Defendants' concealment of the true quality of the Vehicles' security systems. Had Plaintiffs and Class Members been aware of the Defect in the Vehicles, and the Defendants' disregard for the truth, Plaintiffs and Class Members would have paid less for their Vehicles or would not have purchased or leased them at all.

199. The value of Plaintiffs' and Class Members' Vehicles have diminished as a result of Defendants' fraudulent concealment of the Defect, which has made any reasonable consumer reluctant to purchase any of the Vehicles, let alone pay what otherwise would have been fair market value for the Vehicles.

200.   Accordingly, Defendants are liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

201.   Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and the representations that Defendants made to them, in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT V**
**Violation of the California Consumer Legal Remedies Act**
**Cal. Civ. Code § 1750 *et seq.***
(On Behalf of Plaintiffs Lamons, Gonzalez and DiGiacinto and the Nationwide Class or alternatively on behalf of the California Subclass)

202.   Plaintiffs Lamons, Gonzalez and DiGiacinto restate and reallege the allegations in paragraphs 1-127 127as if fully set forth herein.

203.   California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.,* proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

204.   The Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

205.   Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiffs Lamons, Gonzalez and DiGiacinto, the other Class Members, and Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

206.   As alleged herein, Defendants made misleading representations and omissions concerning the benefits, performance, and safety of the Vehicles.

207.   In purchasing or leasing the Vehicles, Plaintiffs Lamons, Gonzalez and DiGiacinto and other Class Members were deceived by Defendants' failure to disclose its knowledge of the Defect.

208.   Defendants' conduct as described herein was and is in violation of the CLRA. Defendants' conduct violates at least the following enumerated CLRA provisions:

> a.  Cal. Civ. Code § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities that they do not have.
>
> b.  Cal Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade if they are of another.
>
> c.  Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised.
>
> d.  Cal Civ. Code § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

209.   Defendants intentionally and knowingly misrepresented and omitted material facts regarding the Vehicles with an intent to mislead Plaintiffs Lamons, Gonzalez and DiGiacinto and Class Members.

210.   In purchasing or leasing the Vehicles, Plaintiffs Lamons, Gonzalez and DiGiacinto and other Class Members were deceived by Defendants' failure to disclose their knowledge of the Defect.

211.   Plaintiffs Lamons, Gonzalez and DiGiacinto and other Class Members had no way of knowing Defendants' representations were false, misleading, and incomplete or knowing the true nature of the Defect.

34

212.   As alleged herein, Defendants engaged in a pattern of deception and public silence in the face of a known Defect. Plaintiffs Lamons, Gonzalez and DiGiacinto and other Class Members did not, and could not, unravel Defendants' deception on their own.

213.   Defendants knew or should have known their conduct violated the CLRA.

214.   Defendants owed Plaintiffs Lamons, Gonzalez and DiGiacinto and the Class Members a duty to disclose the truth about the Defect because the defect created a safety hazard and Defendants:

> a.   Possessed exclusive knowledge of the Defect,
>
> b.   Intentionally concealed the foregoing from Plaintiffs Lamons, Gonzalez and DiGiacinto and Class Members; and/or
>
> c.   Made incomplete representations in advertisements and on its website, failing to warn the public of the Defect.

215.   Defendants had a duty to disclose that the Vehicles were fundamentally flawed as described herein, because the Defect created a safety hazard, and Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members relied on Defendants' material misrepresentations and omissions regarding the features of the Vehicles.

216.   Defendants' conduct proximately caused injuries to Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members that purchased the Vehicles and suffered harm as alleged herein.

217.   Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members incurred costs, including overpaying for their Vehicles that have suffered a diminution in value.

218.   Defendants' violations cause continuing injuries to Plaintiffs Lamons, Gonzalez and DiGiacinto and other Class Members.

CLASS ACTION COMPLAINT

219.   Defendants' unlawful acts and practices complained of herein affect the public interest.

220.   Defendants knew of the Defect, and that the Vehicles were materially compromised by it.

221.   The facts concealed and omitted by Defendants from Plaintiffs Lamons, Gonzalez and DiGiacinto and other Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase a Vehicle or pay a lower price. Had Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members known about the defective nature of the Vehicles, they would not have purchased the Vehicles or would not have paid the prices they paid.

222.   California Plaintiffs' and the other Class Members' injuries were proximately caused by Defendants' unlawful and deceptive business practices.

223.   Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs Lamons, Gonzalez and DiGiacinto seek an order enjoining Defendants from engaging in the methods, acts, or practices alleged herein, including further concealment of the Defect.

224.   Plaintiffs Lamons, Gonzalez and DiGiacinto sent a notice letter to Defendants on September 8, 2022.

225.   Pursuant to Cal. Civ. Code § 1782, if Defendant does not rectify its conduct within 30 days, Plaintiffs Lamons, Gonzalez and DiGiacinto intend to amend this Complaint to add claims under the Cal. Civ. Code for actual damages; restitution of money to Plaintiffs Lamons, Gonzalez and DiGiacinto and Class Members, and the general public; punitive damages; an additional award of up to $5,000 to each Plaintiff and any Class Member who is a "senior citizen"; attorneys' fees and costs; and other relief that this Court deems proper.

**COUNT VI**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 *et seq.***

36

(On Behalf of Plaintiffs  Lamons, Gonzalez and DiGiacinto and the Nationwide Class or alternatively on behalf of the California Subclass)

226.  Plaintiffs Lamons, Gonzalez and DiGiacinto restate and reallege the allegations in paragraphs 1-127as if fully set forth herein.

227.  California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.,* proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising."

228.  Defendants' conduct, as described herein, was and is in violation of the UCL. Defendants conduct violates the UCL in at least the following ways:

      a.  By failing to disclose that the Defect;

      b.  By selling and leasing Vehicles that suffer from the Defect;

      c.  By knowingly and intentionally concealing from Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members the Defect;

      d.  By marketing Vehicles as safe, convenient, and defect free, with cutting edge technology, all while knowing of the Defect; and

      e.  By violating other California laws, including California consumer protection laws.

229.  Defendants intentionally and knowingly misrepresented and omitted material facts regarding the Vehicles with intent to mislead Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members.

230.  In purchasing or leasing the Vehicles, Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members were deceived by Defendants' failure to disclose the Defect.

231.  Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members reasonably relied upon Defendants' false misrepresentations and omissions. They had no way of knowing that Defendants' representations were false, misleading, and incomplete.

CLASS ACTION COMPLAINT

As alleged herein, Defendants engaged in a pattern of deception and public silence in the face of a known defect. Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members did not, and could not, unravel Defendants' deception on their own.

232.   Defendants knew or should have known that their conduct violated the UCL.

233.   Defendants owed Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members a duty to disclose the truth about the Defect because the Defect created a safety hazard and Defendants:

        a.  Possessed exclusive knowledge of the Defect;

        b.  Intentionally concealed the foregoing from Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members; and/or

        c.  Made incomplete representations by failing to warn the public or to publicly admit the Defect.

234.   Defendants had a duty to disclose the Defect, because Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members relied on Defendants' material misrepresentations and omissions.

235.   Defendants' conduct proximately caused injuries to Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members that purchased the Vehicles and suffered harm as alleged herein.

236.   Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members incurred costs, including overpaying for their Vehicles that have suffered a diminution in value.

237.   Defendants' violations cause continuing injuries to Plaintiffs Lamons, Gonzalez and DiGiacinto and Class Members.

238.   Defendants' unlawful acts and practices complained of herein affect the public interest.

38

239.   Defendants' misrepresentations and omissions alleged herein caused Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members to make their purchases of their Vehicles. Absent those misrepresentations and omissions, Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members would not have purchased these Vehicles, would not have purchased these Vehicles at the prices they paid, and/or would have purchased less expensive alternative vehicles that did not contain the Defect and did live up to industry standards.

240.   Accordingly, Plaintiffs Lamons, Gonzalez and DiGiacinto and the other Class Members have suffered injury-in-fact, including lost money or property, as a result of Defendants' misrepresentations and omissions.

241.   Plaintiffs Lamons, Gonzalez and DiGiacinto request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs Lamons, Gonzalez and DiGiacinto and Class Members any money Defendants acquired by unfair competition, including restitution and/or disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345; and for such other relief as may be appropriate.

## COUNT VII
### Violation of Implied Warranty of Merchantability
### Cal. Com. Code § 2314 *et seq.*
(On Behalf of Plaintiffs  Lamons, Gonzalez and DiGiacinto and the Nationwide Class or alternatively on behalf of the California Subclass)

242.   Plaintiffs Lamons, Gonzalez and DiGiacinto restate and reallege the allegations in paragraphs 1-127 as if fully set forth herein.

243.   Defendants are and were at all relevant times merchants with respect to motor vehicles under Cal. Com. Code § 2104.

244.   A warranty that the Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to Cal. Com. Code § 2314.

39

245.   Defendants marketed the Vehicles as safe and reliable vehicles. Such representations formed the basis of the bargain in California Plaintiffs' and Class Members' decisions to purchase or lease the Vehicles.

246.   Plaintiffs Lamons, Gonzalez and DiGiacinto and other Class Members purchased or leased the Vehicles from Defendants, through Defendants' authorized agents for retail sales, through private sellers, or were otherwise expected to be the eventual purchasers of the Vehicles when bought from a third party. At all relevant times, Defendants were the manufacturers, distributors, warrantors, and/or sellers of the Vehicles.

247.   Defendants knew or had reason to know of the specific use for which the Vehicles were purchased or leased.

248.   Because of the Defect, the Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

249.   Defendants knew about the Defect, allowing Defendants to cure their breach of its warranty if they chose.

250.   Defendants' attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the Defect. The time limits contained in Defendants' warranty periods were also unconscionable and inadequate to protect Plaintiffs Lamons, Gonzalez and DiGiacinto and other Class Members. Among other things, Plaintiffs Lamons, Gonzalez and DiGiacinto and other Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and other Class Members, and Defendants knew of the defect at the time of sale.

CLASS ACTION COMPLAINT

251.  Plaintiffs Lamons, Gonzalez and DiGiacinto and Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein. Affording Defendants a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

252.  Accordingly, Defendants are liable to Plaintiffs Lamons, Gonzalez and DiGiacinto and Class Members for damages in an amount to be proven at trial.

**COUNT VIII**
**Violations of the Texas Deceptive Trade Practices Act**
**Texas Business and Commerce Code § 17.41, *et seq.***
(On Behalf of Plaintiff Moton and the Texas Subclass)

253.  Plaintiff Moton restates and realleges the allegations in paragraphs 1-127 as if fully set forth herein.

254.  The Texas Deceptive Trade Practices Act ("TDTPA"), Texas Business and Commerce Code § 17.41, *et seq.* prohibits false, misleading or deceptive acts and practices in connection with a trade or business.

255.  Plaintiff Moton and the Texas Class Members are "consumers" within the meaning of § 17.54(4) of TDTPA in that they are individuals who acquired by purchase the goods or products that form the basis of this case and suffered damages for which they did not receive compensation from any third party, person or entity.

256.  As alleged herein, Defendants made misleading representations and omissions concerning the benefits, performance, and safety of the Vehicles.

257.  In purchasing or leasing the Vehicles, Plaintiff Moton and Texas Class Members were deceived by Defendants' failure to disclose its knowledge of the Defect.

258.  Defendants intentionally and knowingly misrepresented and omitted material facts regarding the Vehicles with an intent to mislead Plaintiff Moton and Class Members.

41

259.   Defendants' conduct proximately caused injuries to Plaintiff Moton and the Texas Class Members that purchased the Vehicles and suffered harm as alleged herein.

260.   The facts concealed and omitted by Defendants from Plaintiff Moton and Texas Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase a Vehicle or pay a lower price. Had Plaintiff Moton and the Texas Class Members known about the defective nature of the Vehicles, they would not have purchased the Vehicles or would not have paid the prices they paid.

261.   Plaintiffs' and the other Class Members' injuries were proximately caused by Defendants' unlawful and deceptive business practices.

262.   Accordingly, Defendants are liable to Plaintiff Moton and the Texas Class Members for damages in an amount to be proven at trial.

### COUNT IX
### Violations of the Tennessee Consumer Protection Act
### Tenn. Code Ann. § 47-18-101, *et seq.*
(On Behalf of Plaintiff Ford and the Tennessee Subclass)

263.   Plaintiff Christine Ford restates and realleges the allegations in paragraphs 1-127 127as if fully set forth herein.

264.   The Tennessee Consumer Protection Act, Tenn. Code § 47-18-104, prohibits deceptive trade practices.

265.   Defendants advertised and sold "goods" in "trade" and "commerce" as meant by Tenn. Code § 47-18-103.

266.   Defendants engaged in deceptive trade practices pertaining to the sale of Class Vehicles to Plaintiff Ford and the Tennessee Class, in violation of Tenn. Code § 47-18-104 (5),(7), including but not limited to the following:

      a.   Defendants misrepresented material facts pertaining to the Class Vehicles to Plaintiff Ford and the Tennessee Class by representing

42

that the Vehicles they were selling had no significant defects, that the Vehicles were reliable, and would perform and operate properly;

b. Defendants omitted, suppressed, and concealed the material fact of the Defect in the Class Vehicles that was known to Defendants; Defendants engaged in deceptive practices by failing to disclose the Defect in the Class Vehicles to Plaintiff Ford and the Tennessee Class; and

c. Defendants engaged in deceptive practices by failing to take proper action following the increase in theft of the Class Vehicles.

267.  As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff Ford and the Tennessee Class Members sustained damage because they own or lease Vehicles that are diminished in value as a result of Defendants' concealment of the true quality of the Vehicles' security systems.

268.  The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts were made with intent to defraud, and in reckless disregard of Plaintiff Ford's and Tennessee Class Members' rights and the representations that Defendants made to them, in order to enrich Defendants.

269.  Had Plaintiff Ford and Tennessee Class Members been aware of the Defect in the Vehicles, and the Defendants' disregard for the truth, they would have paid less for their Vehicles or would not have purchased or leased them at all.

270.  Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Ford and members of the Tennessee Class.

271.  Plaintiff Ford and the Tennessee Class Members seek relief under Tenn. Code § 47-18-109, including, not limited to damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs; and any other just and proper relief available.

43

**COUNT X**
**Violations of the Illinois Consumer Fraud Act**
**815 Ill. Comp. Stat. 505/1, *et seq.***
(On Behalf of Plaintiff Huggins and the Illinois Subclass)

272.   Plaintiff Huggins restates and realleges the allegations in paragraphs 1-127 as if fully set forth herein.

273.   The Illinois Consumer Fraud Act, 815 Ill. Comp. Stat. 505/2, prohibits unfair methods of competition and unfair or deceptive acts or practices in connection with any trade or commerce.

274.   Plaintiff Huggins and the Illinois Class Members are "consumers" within the meaning of 815 Ill. Comp. Stat. 505/1.

275.   As alleged herein, Defendants made misleading representations and omissions concerning the benefits, performance, and safety of the Vehicles.

276.   In purchasing or leasing the Vehicles, Plaintiff Huggins and Illinois Class Members were deceived by Defendants' failure to disclose its knowledge of the Defect.

277.   Defendants intentionally and knowingly misrepresented and omitted material facts regarding the Vehicles with an intent to mislead Plaintiff Huggins and Class Members.

278.   Defendants' conduct proximately caused injuries to Plaintiff Huggins and the Illinois Class Members that purchased the Vehicles and suffered harm as alleged herein.

279.   The facts concealed and omitted by Defendants from Plaintiff Huggins and Illinois Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase a Vehicle or pay a lower price. Had Plaintiff Huggins and the Illinois Class Members known about the defective nature of the

44

Vehicles, they would not have purchased the Vehicles or would not have paid the prices they paid.

280.   Plaintiffs' and the other Class Members' injuries were proximately caused by Defendants' unlawful and deceptive business practices.

281.   Plaintiff Huggins and the Illinois Class Members seek relief under 815 Ill. Comp. Stat. 510/10a, including, not limited to damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs; and any other just and proper relief available.

**COUNT XI**
**Violations of the Illinois Uniform Deceptive Trade Practices Act**
**815 Ill. Comp. Stat. 505/2(a),** *et seq.*
(On Behalf of Plaintiff Huggins and the Illinois Subclass)

282.   Plaintiff Huggins restates and realleges the allegations in paragraphs 1-127 as if fully set forth herein.

283.   The Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2(a), prohibits suppliers from engaging in deceptive trade practices.

284.   Defendants are "persons" who engaged in deceptive trade practices pertaining to the sale of Class Vehicles to Plaintiff Huggins and the Illinois Class, in violation of 815 Ill. Comp. Stat. 510/2(a)(5),(7), including but not limited to the following:

a. Defendants misrepresented material facts pertaining to the Class Vehicles to Plaintiff Huggins and the Illinois Class by representing that the Vehicles they were selling had no significant defects, that the Vehicles were reliable, and would perform and operate properly;

b. Defendants omitted, suppressed, and concealed the material fact of the Defect in the Class Vehicles that was known to Defendants; Defendants engaged in deceptive practices by failing to disclose the

45

Defect in the Class Vehicles to Plaintiff Huggins and the Illinois Class; and

   c. Defendants engaged in deceptive practices by failing to take proper action following the increase in theft of the Class Vehicles.

285.   As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff Huggins and the Illinois Class Members sustained damage because they own or lease Vehicles that are diminished in value as a result of Defendants' concealment of the true quality of the Vehicles' security systems.

286.   The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts were made with intent to defraud, and in reckless disregard of Plaintiff Huggins' and Illinois Class Members' rights and the representations that Defendants made to them, in order to enrich Defendants.

287.   Had Plaintiff Huggins and Illinois Class Members been aware of the Defect in the Vehicles, and the Defendants' disregard for the truth, they would have paid less for their Vehicles or would not have purchased or leased them at all.

288.   Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Huggins and members of the Illinois Class.

289.   Plaintiff Huggins and the Illinois Class Members seek relief under 815 Ill. Comp. Stat. 510/3, including, not limited to damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs; and any other just and proper relief available.

**COUNT XII**
**Violations of the Missouri Merchandising Practices Act**
**Mo. Stat. § 407.010, *et seq.***
(On Behalf of Plaintiff Walson and the Missouri Subclass)

46

290.   Plaintiff Walson restates and realleges the allegations in paragraphs 1-127 as if fully set forth herein.

291.   Plaintiff Walson and Missouri Class Members purchased "merchandise" in "trade" or "commerce" as meant by Mo. Stat. § 407.010.

292.   Defendants engaged in deceptive trade practices pertaining to the sale of Class Vehicles to Plaintiff Walson and the Missouri Class, in violation of Mo. Stat. § 407.020 (1), including but not limited to the following:

a.   Defendants misrepresented material facts pertaining to the Class Vehicles to Plaintiff Walson and the Missouri Class by representing that the Vehicles they were selling had no significant defects, that the Vehicles were reliable, and would perform and operate properly;

b.   Defendants omitted, suppressed, and concealed the material fact of the Defect in the Class Vehicles that was known to Defendants; Defendants engaged in deceptive practices by failing to disclose the Defect in the Class Vehicles to Plaintiff Walson and the Missouri Class; and

c.   Defendants engaged in deceptive practices by failing to take proper action following the increase in theft of the Class Vehicles.

293.   As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff Walson and the Missouri Class Members sustained damage because they own or lease Vehicles that are diminished in value as a result of Defendants' concealment of the true quality of the Vehicles' security systems.

294.   The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts were made with intent to defraud, and in reckless disregard of Plaintiff Walson's and Missouri Class Members' rights and the representations that Defendants made to them, in order to enrich Defendants.

47

295.   Had Plaintiff Walson and Missouri Class Members been aware of the Defect in the Vehicles, and the Defendants' disregard for the truth, they would have paid less for their Vehicles or would not have purchased or leased them at all.

296.   Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Walson and members of the Missouri Class.

297.   Plaintiff Walson and the Missouri Class Members seek relief under Mo. Stat. § 407.025, including, not limited to damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs; and any other just and proper relief available.

## COUNT XIII
### Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law
### 73 Pa. Stat. Ann. § 201-1, *et seq.*
(On Behalf of Plaintiff Cruz and the Pennsylvania Subclass)

298.   Plaintiff Cruz restates and realleges the allegations in paragraphs 1-127 as if fully set forth herein.

299.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. Ann. § 201-1, *et seq.*, was created to protect Pennsylvania consumers from fraudulent or deceptive business practices.

300.   Defendants have knowingly engaged in deceptive, unconscionable, unfair, false, fraudulent and misleading commercial practices, including misleading omissions of material fact, in connection with the marketing, promotion and sale of the Class Vehicles misrepresenting that the Vehicles they were selling had no significant defects, that the Vehicles were reliable, and would perform and operate properly.

301.   Plaintiff Cruz and Pennsylvania Subclass members justifiably relied on Defendants' unlawful conduct in purchasing the Class Vehicles for personal purposes and suffered ascertainable losses of money or diminution of property value as the result

48

of the act or practice declared unlawful by the UTPCPL. Plaintiff Cruz and Pennsylvania Subclass members acted as reasonable consumers would have acted under the circumstances and would not have purchased the Class Vehicles had they known the truth or would not have paid the prices they paid for the Class Vehicles had they known the truth.

302.    Accordingly, pursuant to the aforementioned statutes, Plaintiff Cruz and Pennsylvania Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence.

303.    In addition, given the nature of Defendants' conduct, Plaintiff Cruz and Pennsylvania Subclass members are entitled to recover all available statutory, exemplary, treble, and/or punitive damages, costs of suit, and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary, and all such other relief as the Court deems proper.

## COUNT XIV
### Violations of the Oklahoma Consumer Protection Act
### Okla. Stat. Tit. 15 § 751 *et seq.*
(On Behalf of Plaintiff Music and the Oklahoma Subclass)

304.    Plaintiff Music restates and realleges the allegations in paragraphs 1-127 as if fully set forth herein.

305.    Plaintiff Music and the Oklahoma Subclass members are "persons" within the meaning of Okla. Stat. Tit. 15 § 752.1.

306.    At all relevant times, Defendants are and were engaged in "the course of business" within the meaning of Okla. Stat. Tit. 15 § 753.

307.    The Oklahoma Consumer Protection Act ("OCPA"), Okla. Stat. Tit. 15 § 751 *et seq.*, prohibits numerous unlawful acts, including misleading representations, false advertisements, and false statements.

49

308.  By the conduct described in detail above and incorporated herein, Defendants engaged in unfair or deceptive acts in violation of Okla. Stat. Tit. 15 § 753.

309.  Defendants' omissions regarding the Defect, described above, that result in the Class Vehicles being targeted for theft, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

310.  Defendants intended for Plaintiff Music and the Subclass members to rely on Defendants' omissions of fact regarding the Defect.

311.  Plaintiff Music and the other Subclass members justifiably acted or relied to their detriment upon Defendants' omissions of fact concerning the Defect, as evidenced by Plaintiff Music and the Subclass Members' purchase of their vehicles.

312.  Had Defendants disclosed all material information regarding the Defect to Plaintiff Music and the Subclass members, then Plaintiff Music and the Subclass members would not have purchased or leased the vehicles or would have paid less to do so.

313.  Defendants' omissions deceived Plaintiff Music and the Subclass members.

314.  In addition to being deceptive, the business practices of Defendants were unfair because Defendants knowingly sold to Plaintiff Music and the Subclass Members vehicles with a Defect that renders the Class Vehicles essentially unusable for the purposes for which they were sold. The injuries to Plaintiff Music and the Subclass Members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiff Music or to any competition under all of the circumstances. Moreover, in light of Defendants' exclusive knowledge of the Defect, the injury is not one that Plaintiff Music could have reasonably avoided.

315.  Further, and to the extent required by law, Defendants had a duty to disclose the Defect because disclosure of the Defect was necessary to dispel misleading impressions about the Class Vehicles' that were or might have been created by partial

CLASS ACTION COMPLAINT

representation of the facts. Specifically, Defendants promoted, through its advertisements, that the vehicles had no significant defects, that the Vehicles were reliable, and would perform and operate properly. Specifically, Defendants owed Plaintiff Music and the Subclass Members a duty to disclose all the material facts concerning the Defect because it possessed exclusive knowledge, it intentionally concealed the defect from Plaintiff Music and the Subclass members, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

316.   Defendants' unfair or deceptive acts or practices were likely to, and did, in fact, deceive consumers, including Plaintiff Music and the Subclass Members, about the true reliability, dependability, efficiency, and quality of the Class Vehicles. Defendants' violations present a continuing risk to Plaintiff Music and the Subclass Members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

317.   Plaintiff Music and the Subclass Members suffered ascertainable loss and actual damages as a direct result of Defendants' concealment of and failure to disclose material information, namely, the Defect. Plaintiff Music and the Subclass Members who purchased or leased the Class Vehicles would not have done so, or would have paid significantly less, if the true nature of the Class Vehicles had been disclosed. Plaintiff Music and the Subclass Members also suffered diminished value of their vehicles.

318.   Pursuant to Okla. Stat. Tit. 15 § 761.1, the Plaintiff Music and the Subclass seek an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the OCPA.

**COUNT XV**
**Violations of the Indiana Deceptive Consumer Sales Act**
**Ind. Code 15 § 24-5-0.5-0.1 *et seq.***
(On Behalf of Plaintiff Daniels and the Indiana Subclass)

51

1

2      319.   Plaintiff Daniels restates and realleges the allegations in paragraphs 1-127

3  as if fully set forth herein.

4      320.   Indiana's Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-3(a)

5  ("IDCSA") prohibits suppliers from engaging in deceptive, unfair, and abusive acts or

6  omissions in consumer transactions.

7      321.   Defendants are "suppliers" who engaged in deceptive, unfair, and unlawful

8  trade acts or practices in the conduct of "consumer transactions" pertaining to the

9  purchase and sale of Class Vehicles to Plaintiff Daniels and the Indiana Class, in violation

10  of Ind. Code § 24-5-0.5-3, including but not limited to the following:

11          a.   Defendants misrepresented and fraudulently advertised material facts

12              pertaining to the Class Vehicles to Plaintiff Daniels and the Indiana

13              Class by representing and advertising that the Vehicles they were

14              selling had no significant defects, that the Vehicles were reliable, and

15              would perform and operate properly;

16          b.   Defendants omitted, suppressed, and concealed the material fact of

17              the Defect in the Class Vehicles that was known to Defendants;

18              Defendants engaged in deceptive, unfair, and unlawful trade acts or

19              practices by failing to disclose the Defect in the Class Vehicles to

20              Plaintiff Daniels and the Indiana Class; and

21          c.   Defendants engaged in deceptive, unfair, and unlawful trade acts or

22              practices by failing to take proper action following the increase in

23              theft of the Class Vehicles.

24      322.   As a direct and proximate result of Defendants' deceptive trade practices,

25  Plaintiff Daniels and the Indiana Class Members sustained damage because they own or

26  lease Vehicles that are diminished in value as a result of Defendants' concealment of the

27  true quality of the Vehicles' security systems.

28

323.   The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts were made with intent to defraud, and in reckless disregard of Plaintiff Daniels' and Indiana Class Members' rights and the representations that Defendants made to them, in order to enrich Defendants.

324.   Had Plaintiff Daniels and Indiana Class Members been aware of the Defect in the Vehicles, and the Defendants' disregard for the truth, Plaintiffs and Class Members would have paid less for their Vehicles or would not have purchased or leased them at all.

325.   Defendants' actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff Daniels and members of the Indiana Class.

326.   Plaintiff Daniels and the Indiana Class Members seek relief under Ind. Code §24-5-0.5-4, including, not limited to damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs; and any other just and proper relief available under the IDCSA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes described above, seek the following relief:

a.   An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the classes as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Classes requested herein;

b.   Judgment in favor of Plaintiffs and the Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c.   An order providing injunctive and/or other equitable relief as necessary to protect the interests of the Classes as requested herein;

53

d. An order requiring Defendants to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

e. A judgment in favor of Plaintiffs and the Classes awarding them pre-judgment and post judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law, and

f. An award of such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury as to all triable claims.

Dated: October 24, 2022          **SIRI & GLIMSTAD LLP**

By: _/s/ Mason Barney_____
Mason Barney (*Pro Hac Vice to be filed*)
Ursula Smith (*Pro Hac Vice to be filed*)

**PRECEPT GROUP, LLP**
Christopher Wren Czaplak

Attorneys for Plaintiffs

CLASS ACTION COMPLAINT